## The R. and W. Jenkinson Company, a Corporation, v. Charles Porzel and William R. Succop and Carrie A. Kaiser, Appellants.

*Sheriff's sale—Contract—Trusts and trustees—Interest.*

Where a property is bought in at sheriff's sale by a junior judgment creditor under an agreement with a senior judgment creditor that the former will divide up the land into lots, sell the same, and out of the proceeds pay taxes and certain other incumbrances, and pay the senior judgment without interest, the court will decree that the purchaser holds the land charged with a trust in favor of the senior creditor, to sell the same within a reasonable time, and that if he delays for more than a year to effect a sale of lots sufficient to pay the senior judgment, interest will be charged upon it.

Argued Nov. 1, 1898. Appeal, No. 42, Oct. T., 1898, by defendants, from decree of C. P. No. 2, Allegheny Co., Oct. T., 1896, No. 174, on bill in equity. Before Green, Williams, McCollum, Mitchell, Dean and Fell, JJ. Affirmed.

Bill in equity to declare a trust.

The suit was brought to enforce the following agreement in writing:

"This agreement, made June 29, 1892, by and between Frank W. Hughey, assignee of two certain judgments against Charles Klopfer, Nos. 601 and 602, June term, 1890, of the first part, and Magnus Pflaum, attorney and trustee in this behalf of the estate of John Kaiser, deceased, of the other part, witnesseth, that in consideration of the conditions and stipulations hereinafter mentioned, the said Frank W. Hughey will assign the said above mentioned two judgments to the said Magnus Pflaum, attorney and trustee in this behalf of the estate of John Kaiser, deceased.

"First. The said Frank W. Hughey is to receive for said two judgments, the sum of $3,000, without interest, as follows, to wit: Whereas, the said two judgments are liens upon the real estate of said Charles Klopfer, succeeding a prior mortgage of $10,000, and preceding judgments aggregating about $16,000, due to said John Kaiser's estate, and whereas, to collect the judgments herein mentioned, it is necessary to control said preceding mortgage, which is contemplated by the said Magnus

Pflaum, to foreclose the same, buy in the land, subdivide and sell the same; and for the purpose of controlling said mortgage, it is necessary to borrow sufficient money for the purchase thereof, as well as for expense of sheriff's sale, which said borrowed money must first be repaid out of the proceeds of the subdivision sales.

"Now therefore, it is hereby agreed and understood, that the above mentioned $3,000 are to be paid to said Frank W. Hughey after the payment; first, of all interest due upon said mortgage or a renewal thereof; second, after payment of taxes and assessments due from time to time accruing; third, after the payment from each of said subdivision sales of the proportionate part of the principal due upon said mortgage, the remainder of the proceeds from each sale, until $3,000, without interest, is paid, and whereas, the said remaining portion of the proceeds of each subdivision sale may consist of purchase money mortgages, said Frank W. Hughey to have the option to accept the same as money at the face value. And it is hereby fully understood and agreed, that the said Magnus Pflaum, attorney and trustee as aforesaid, by authority of his clients, will protect the said Frank W. Hughey of and from any possible loss or injury by reason of nonpayment of interest on said renewed mortgage, or nonpayment of taxes or assessments by which the said property might be sold and his title divested.

"It is understood that $250 have been paid heretofore on account of the original judgments against Klopfer, assigned as before written. The original amount of said judgments was $3,550, with interest from March 17, 1891.

"And it is further agreed, that if after the assignment of the said judgment to Magnus Pflaum, attorney, etc., as aforesaid, and upon the sheriff's sale of said Klopfer property, it should be bought in by said Magnus Pflaum at a nominal amount, or at a sum not sufficient to reach the whole sum due upon the said judgments, that in that case he, the said Magnus Pflaum, will reassign to the said Frank W. Hughey all thereof over and above the sum of $3,000.

" FRANK W. HUGHEY,

" MAGNUS PFLAUM,

" Attorney and Trustee."

EWING, P. J., filed the following opinion:

The plaintiff is the assignee of F. W. Hughey, Esq., who, for himself and others, was the owner of judgments Nos. 601 and 602 of June term, 1890, against Charles F. Klopfer, aggregating on June 29, 1892, about $3,700.

The defendants were the executors of John Kaiser, deceased, but in this proceeding are personally responsible for their contract and acts. At that time, it seems that Charles F. Klopfer was the owner of the tract of land in the Twelfth ward of the city of Allegheny, described in the second section of plaintiff's bill, as containing four acres, three rods and seven perches. On this tract of land was a mortgage, owned by D. Z. Brickel, amounting to about $10,000, which was the first lien. The judgments held by Mr. Hughey were the second lien, and following those liens were judgments obtained by John Kaiser, in his lifetime, amounting to about $16,000.

It appears that Charles F. Klopfer was insolvent. Mr. Kaiser's executors and their attorney conceived the plan of saving the amount of their judgments, by getting control of the preceding liens, selling the property as a whole, and then reselling it at a profit, and they entered into negotiations with Mr. Brickel and Mr. Hughey for the control of their judgments. The result was the agreement, which is exhibit "A" of plaintiff's bill, made June, 1892, between Frank W. Hughey, for himself, and Magnus Pflaum, who signs as "attorney and trustee." The evidence shows, and the agreement itself shows, that he was acting for these defendants, as executors of John Kaiser. The evidence in this case shows that he had power and authority from them to so act, and it is conceded that they are responsible for his acts.

In pursuance of this arrangement, and with the assent of Mr. Brickel, the owner of the mortgage, a judgment having been obtained on the mortgage and an execution issued thereon, the property was sold in September, 1892, for $14,100, the bid being made by Mr. Pflaum, acting as attorney for the executors of John Kaiser. The title, however, was taken in the name of D. Z. Brickel, the owner of the mortgage and execution creditor. The purchase money was applied by the sheriff, first, to the payment of costs; second, to the payment of the mortgage; and third, to the judgments held by Mr. Hughey. To these judg-

ments, the sum of $3,200 was distributed, Mr. Hughey having assigned the judgments to Mr. Brickel, in order to have the proposition carried out. Mr. Brickel took the title in order to permit the arrangement, set out in exhibit "A," of plaintiff's bill, to be consummated, conveyed to William T. Howe, and William T. Howe conveyed to the defendants in this case. All of these conveyances were under this arrangement. A new mortgage was given by the defendants to William T. Howe, who assigned to the Safe Deposit Company to raise the money to pay Mr. Brickel his mortgage, which was done, and the defendants held the property under this arrangement. This is both admitted and proved. It constitutes the defendants' trustees, and trustees to pay first, after paying the necessary expenses, the money borrowed to pay this mortgage to Mr. Brickel, and to pay the $3,000, which, under the agreement, was to be paid to Mr. Hughey, and, for the purposes of this case, the plaintiff, Mr. Hughey, the corporation stands in his shoes.

Before this sheriff's sale, Mr. Klopfer had laid out a plan of lots, comprising this entire plan of eighty lots, the largest of which had a residence erected thereon, the lot fronting 90.48 feet on Klopfer avenue, the principal street, and running back the average depth of about 175 feet, being 142 feet wide in the rear. The other lots were mostly comparatively small lots.

The defendants, in their amended answer, allege that the written agreement of June 29, 1892, did not correctly state the agreement: first, in this, that the residence lot was not included in this agreement, or that Hughey was not to share in the proceeds of that lot until the amount of the mortgage debt had been paid, and it was to be security therefor; and also, allege other mistakes in, and modifications of, the agreement. The testimony on that point is squarely contradicted by Mr. Hughey. It is Mr. Pflaum on one side and Mr. Hughey on the other, and even if there was no evidence on the part of the plaintiff, the evidence of the defendants entirely fails to make such a case as to modify the written agreement on either point. The written agreement, then, is the contract between them.

Carrie A. Kaiser, one of the defendants, having married and removed from this country, executed on January 8, 1895, her

deed, conveying her interest and right in this property to Charles Porzel and William R. Succop, the other defendants. The bill was filed August 6, 1896. She may, therefore, be dismissed from further consideration in this case, although possibly she would be liable if there was money that had been squandered, or for the portion that was conveyed in which she joined in the deeds.

The defendants, having gotten possession of the property, in the latter part of 1892, proceeded to make some arrangement for sale, and, on inquiry, were advised that the plan of Mr. Klopfer was not a judicious division of the property, and, none of it having been sold, they employed a surveyor and had a new plan made, changing slightly the location of the streets, and also changing the lots, enlarging the residence lot, and making in all fifty-four lots in their plan. After this was done, and perhaps after one sale had been made, they came to the conclusion that it was necessary to grade the leading street, the name of which had been changed from Klopfer street to Kaiser street, and they proceeded to grade it. The testimony indicates that the land was steep and a rather rough piece of ground on which to lay out a plan of lots. Having graded this street, they met another difficulty: the earth thrown out on the lower side of the street slipped down, or caused a slip, onto the property of the adjoining owner, and he threatened them with suits. They first undertook with a weak wall to sustain their ground and cleaned off the property on which the ground had slipped down; but that soon gave way, and they were again threatened with suits, and they again proceeded to erect very substantial walls, seventy-two feet in length; and on further advice and consultation with their architect and attorney, they built those walls so that they would be not only walls to sustain their lots and protect that below, but would answer for the foundations of two houses, and in part for a third. They then, on the advice of the architect and of others proceeded to build two houses, to aid in the sale of the property, and to utilize the walls which they had thus built.

It is notorious and well known by everybody familiar with the business history of this region that in the summer of 1892 there was what was called a boom in the suburban and small lot business; a large number of people were getting rich by

laying out property in small lots and selling them, and a great
many others were getting rich in a small way by buying those
lots on margins and expecting them to advance; but that boom
collapsed early in 1893, and has never recovered.   The result
has been a very slow sale of lots, at any price, and the houses
built on these lots have been unsalable at what the defendants
claim is cost, and perhaps unsalable at any price that would not
be very considerably below cost.

The defendants claim that Mr. Hughey was fully advised of
these proceedings on their part.   He admits that he consented
to the changing of the plan; he denies that he consented or
advised or arranged for the other changes, to wit: the grading
of the streets, the building of the walls, and the building of
the houses.   He admits that he was informed of these things,
but says that the grading had been partly done before he was
informed of it, and it was after the work was in progress that
he was informed of the other matters, and that he neither as-
sented nor dissented, deeming it the business of the defend-
ants.   It would have been a very safe thing for the defendants
to have had an agreement in writing with Mr. Hughey, so that
there would be no question about his assent to their spending
money in this way.   He might have known of their doing this
work, and, assuming that it was their own lookout, and that they
were responsible, have decided to stand on his agreement.

From the testimony, I am unable to find affirmatively that
Mr. Hughey advised and formally assented to this work being
done as a part of the business of the defendants in carrying out
their trusts; but I do find from his own testimony that he knew
of the work progressing, and knew that they supposed that the
cost would come out of the general fund, and that he did not
object thereto.

The defendants, according to their testimony, had received,
on the sale of the residence property and from other sources,
the sum of $9,712.89, up to May 7, 1896, the date of filing the
amended answer.

The defendants filed with their amended answer an account
of the receipts and expenditures.   A portion of these expendi-
tures or payments the plaintiff admits; the others he admits
were paid, but denies that they are to be charged against the
plaintiff in this action.   The items admitted are: Interest on

the mortgage in all, $1,756.35; payment of taxes, $972.84; and payments on the principal of the mortgage, $140 on May 1, 1894, and $4,400 on May 14, 1895, in all, $7,269.19.

The defendants also paid, in addition to these items, the sheriff's costs and list of liens, together, $128; $229.92 to Mr. Brickel on account of the principal and interest of the mortgage; other costs, running from September 29, 1892, to May 27, 1895, which, in exhibit "F," offered in evidence, are called court costs, and include recording of deeds, acknowledging mortgages, satisfying records, power of attorney and so on, incurred in the purchase at sheriff's sale, or in the various transfers that have been made in relation to this trust, amounting in all to $45.60; $75.00, attorney's fees, to Magnus Pflaum, Esq., for the management of this business, he being attorney for the trustees; $161.40 for insurance on the residence property before it was sold; sundry items for surveying and advertising in relation to these lots, amounting in all to $181. Then there are other charges for which the defendants claim credit; sundry items in their account, amounting to $1,777.88, which was the cost of building these permanent walls, which are made foundations of houses, and which the plaintiff denies as affecting him, and also the amount paid for building the houses, $3,829.17; extra work on the street lots, $37.16; for plumbing, $211; for lime and sand, $14.30, and for an architect, $283.85, which defendants claim should be allowed and plaintiff denies. There are for repairing streets and grading and making fences, three items, in all, $1,174.62.

We find that the cost of the surveying for the new plan, and the making plans of lots, was with the consent and approval of Mr. Hughey, and was a reasonable expense to incur in the management of the trust, and that the item for building fences, under the circumstances alleged, was a part of the management of the trust. The sheriff's cost and list of liens are a part of the necessary expense, as also the court costs and the attorney's fee of $75.00 and the insurance; and it would seem to us that the reasonable cost of grading the street to make it accessible so as to sell the lots in a new plan, would be a clear exercise of discretion, as lots were hardly salable if inaccessible. These large walls and the building of the houses were matters which were outside of the discretion of the executors, as to the other

parties, unless by their direction and agreement; and the trustees took the risk and responsibility themselves. As to whether the facts found on the testimony make such a consent and agreement is further on.

## CONCLUSIONS OF LAW.

In this case the first question is as to the agreement. Defendant's answer denies that they are trustees, or that there is any trust in this case, and that view has been strenuously argued by counsel; and yet the facts they admit clearly make them trustees, and trustees in part for the plaintiff.

Whether this agreement should have been made or not is not a matter for us to determine. It is at least a very great risk to take for executors or trustees to undertake to save claims by incurring such expense.

The sheriff's sale indicates that the agreement was largely for the benefit of the Kaiser estate. The property was supposed by these executors to be worth much more than the mortgage and the first judgments, or they would not have bid the price they did; more than the amount that Mr. Hughey agreed to take on his judgments was realized from the sheriff's sale.

We interpret this agreement to mean that these defendants took this property as trustees, with the understanding that they were to subdivide the property or sell under the subdivisions that had been made by Klopfer, in a reasonable and ordinary way. It meant, of course, that they were to sell off the property, and not only pay the mortgage indebtedness, but pay the $3,000 to Mr. Hughey within a reasonable time. That $3,000 was not to bear interest, and that of itself would require prompt action and prompt sales on the part of the trustees. Good faith to Mr. Hughey required that. They agreed to take care of the mortgage debt, and we interpret the agreement to mean that after payment of the reasonable and proper expenses, the money was to be divided from time to time, so that Mr. Hughey would get the proportion which his $3,000 bore to the $10,253.80 of the mortgage. This, we think, is the clear and reasonable construction of the agreement.

The defendants have not proceeded with the promptness that trustees should have done under an agreement of this kind. We are of the opinion that they themselves run the risk of getting

back the money that they have put in these houses and these walls; but, Mr. Hughey having had knowledge that they were building these and doing this looking towards the sale of the property, and not having objected and protested, we are of the opinion that equity requires that these trustees should not, at present, be obliged to pay out of their own funds money which they do not have on hand. They have paid the mortgage indebtedness, to the amount of $4,815. Substantially they have advanced most of the money to make these improvements on the property and build these houses. We will not order, at present, that the defendants pay any part of this money to Mr. Hughey or his representatives; but, under the circumstances, this agreement having been made looking towards a speedy sale of the property in subdivisions, and Mr. Hughey having agreed that no interest should be paid, we think that his representative is, in equity, entitled to interest on the $3,000, after one year from the date of the sheriff's sale. The items of $1,777.88, $3,829.17, paid to Mr. Feller, the plumbing bills of $211, and the architect's bill of $283.85, should be paid hereafter only after the payment of the amount coming to the plaintiff. All the other items are chargeable before the money is coming to the plaintiff. Let a decree be prepared by counsel in accordance with these findings.

A decree was entered in accordance with the opinion of the court.

*Error assigned* among others was the decree of the court.

*M. Pflaum*, for appellant.—The bill alleges the reception by defendants of certain sums, gives credit for certain expenditures, shows a balance in defendants' hands, demands a share therein, and yet claims an accounting. If plaintiff knows the amount due he does not need an accounting; much less a discovery. In such case the defendants should not be deprived of their constitutional right to a trial by a jury: Fidelity Title & Trust Co. v. Weitzel, 152 Pa. 502.

The bill indicates that the account is unilateral, not complicated, does not show any reason or cause for discovery. In such case equity does not grant an accounting for want of jurisdiction: Gloninger v. Hazard, 42 Pa. 389; Passyunk Building

Association's Appeal, 83 Pa. 441; Appeal of Pittsburg & Connellsville R. R., 99 Pa. 177; Paton v. Clark, 156 Pa. 49.

The orphans' court will not punish executors, in case of loss, if occasioned by no neglect, carelessness or remissness of duty: McCourt's App., 11 W. N. C. 161; Jack's App., 94 Pa. 367.

" Where a business is conducted by one who is not exclusive owner, but is accountable in part as a quasi trustee to another, the rule undoubtedly is . . . . that it must be conducted with fair regard to the interest of both parties, and equity will scrutinize closely where there is any reason to suspect fraud, or even opportunity for unfair advantage." There is nothing in this case to call forth this scrutiny: Spring Brook Ry. Co. v. C. & N. Co., 181 Pa. 308.

*James R. Sterrett*, for appellee, was not heard, but cited in his printed brief: Adams's App., 113 Pa. 449; McGowin v. Remington, 12 Pa. 56; Johnston v. Price, 172 Pa. 427; Shriver & Dilworth v. Nimick & Co., 41 Pa. 80; Reeside v. Reeside, 49 Pa. 322; Brush Electric Co.'s App., 114 Pa. 574; Kirkpatrick v. McDonald, 11 Pa. 387.

PER CURIAM, November 14, 1898:

The decree in this case is affirmed on the opinion of the learned court below.